## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Mirakl, Incorporated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 20-cv-11836 |
| v. | ) | |
| | ) | |
| | ) | |
| VTEX Commerce Cloud Solutions LLC, | ) | **FIRST AMENDED** |
| Tyler Greff, Andrew Brownell, Jeremy | ) | **COMPLAINT FOR** |
| Blanford, George Jyh-Wei Chang, Joseph | ) | **INJUNCTIVE RELIEF** |
| Lee, Timothy Shawn Cochran, and Kevin | ) | |
| Gregory Yee, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INTRODUCTION

Plaintiff Mirakl, Incorporated ("Mirakl"), by its undersigned counsel, brings this action for preliminary and permanent injunctive relief and monetary damages as against Defendants VTEX Commerce Cloud Solutions LLC ("VTEX"), George Jyh-Wei Chang ('Chang"), and Joseph Lee ("Lee") and for preliminary and permanent injunctive relief as against Tyler Greff ("Greff"), Andrew Brownell ("Brownell"), Jeremy Blanford ("Blanford"), Timothy Shawn Cochran ("Cochran"), and Kevin Gregory Yee ("Yee")[1]:

---

[1] Pursuant to the agreements to arbitrate between each Greff, ECF 1-1 at ¶ 6, Brownell, ECF 1-7 at ¶ 6, Blanford, ECF 1-6 at ¶ 6, Cochran, ECF 1-4 at ¶ 6, and Yee, ECF 1-5 at ¶ 6, on the one hand, and Mirakl on the other, Mirakl will pursue its claims for damages against those defendants in arbitration. Mirakl expressly reserves all of its claims for damages, and nothing herein shall be construed as a waiver of any damages claims against Greff, Brownell, Blanford, Cochran, and Yee.

**Nature of the Case**

1.      This case arises from the wrongful conduct of Greff, Brownell, Chang, Lee, Cochran, Yee, and Blanford (collectively, the "Individual Defendants"), and VTEX in misappropriating, retaining, acquiring, using, disclosing, or inevitably using or disclosing Mirakl confidential and proprietary information and trade secrets.

**Parties**

2.      Mirakl is Delaware corporation that conducts business internationally and throughout the United States, including at its U.S. corporate headquarters located at 100 Dover Street, Somerville, MA, 02144.  Mirakl is an eCommerce software company that is in the business of, and derives economic benefit from its trade secrets by using them in interstate and international commerce to provide online marketplace software to retailers, manufacturers, wholesalers, and B2C, B2B, and B2B2C companies.

3.      VTEX is a Florida Limited Liability Company that conducts business internationally and throughout the United States, including at its U.S. corporate headquarters located at 12 East 49th Street, New York, NY 10017.  VTEX is an eCommerce software company and is a competitor of Mirakl.

4.      Greff is a former employee of Mirakl who resided in the Commonwealth of Massachusetts and worked for Mirakl in Massachusetts during times relevant to this action.  Greff currently resides in Milwaukee, Wisconsin and works for VTEX.

5.      Brownell is a resident of Maine, a former employee of Mirakl, and a current employee of VTEX.

6.      Chang is a resident of California, a former employee of Mirakl, and a current employee of VTEX.

7. Cochran is a resident of Ohio, a former employee of Mirakl, and a current employee of VTEX.

8. Lee is a resident of Ontario, Canada, a former employee of Mirakl, and a current employee of VTEX.

9. Yee is a resident of Michigan, a former employee of Mirakl, and a current employee of VTEX.

10. Blanford is a resident of Ohio, a former employee of Mirakl, and a current employee of VTEX.

### Jurisdiction and Venue

11. Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this dispute because Mirakl's claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.,* raise federal questions. Mirakl's state law claims fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, because the claims relate so closely to the Federal questions that those claims form part of the same case or controversy.

12. Personal jurisdiction over Defendant VTEX is proper because VTEX regularly transacts business within the Commonwealth of Massachusetts.

13. Personal jurisdiction exists over each of the Individual Defendants because they collectively and individually transacted business in the Commonwealth of Massachusetts at all relevant times including, but not limited to, by:

a. Being employed by Mirakl, a Massachusetts entity;

b. Executing written agreements relating to their employment with Mirakl;

c.     Traveling to Massachusetts several times each year to participate in in-person sales and customer success meetings (*e.g.,* in 2020 alone, Defendants Blanford, Chang, Cochran, Lee, and Yee participated in Mirakl's January 28 and 29, 2020 sales kick off meetings in Massachusetts and Defendant Greff participated in Mirakl's February 12, 2020 customer success meetings);

d.     Staying, sometimes even together, in Airbnb accommodations that were located in Massachusetts and rented by Mirakl for the purpose of conducting Mirakl business and participating in Mirakl business meetings in Massachusetts;

e.     Returning (or failing to return) Mirakl computers and other devices to Mirakl corporate headquarters located in Massachusetts; and

f.     In the case of Greff, residing in Massachusetts and working for Mirakl in Massachusetts for a period of time relevant to this action (including, but not limited to, when he executed the Greff Agreement referenced *infra* at ¶ 18).

14.     This Court also has personal jurisdiction over each of the Individual Defendants based on their written consent to jurisdiction.  ECF Doc. 1-1 at ¶ 10 (Greff); ECF Doc. 1-2 at ¶ 7 (Chang); ECF Doc. 1-3 at ¶ 7 (Lee); ECF Doc. 1-4 at ¶ 10 (Cochran); ECF Doc. 1-5 at ¶ 10 (Yee); ECF Doc. 1-6 at ¶ 10 (Blanford); ECF Doc. 1-7 at ¶ 10 (Brownell).

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and, as to the Individual Defendants, pursuant to the above-referenced agreement(s).  *See supra* at ¶ 14

**<u>Mirakl Employed Greff, Yee, Brownell, Blanford, Chang, Cochran, and Lee in Positions of Significant Responsibility and Trust</u>**

16.     Mirakl provides the leading technology and partner ecosystem needed to launch an eCommerce marketplace.  As a global leader in marketplace platform software, Mirakl's intellectual property generates a significant amount of revenue in interstate and international commerce.  The Individual Defendants, by virtue of their positions with

Mirakl, obtained access to Mirakl's intellectual property for the limited purpose of performing their work for Mirakl.

17.     From January 7, 2019 until September 1, 2020, Mirakl employed Greff as an Education Expert.

18.     Pursuant to the February 6, 2019 Mirakl Employee Assignment of Intellectual Property, Restrictive Covenant and Confidentiality Agreement (the "Greff Agreement"), which was an explicit condition of Greff's employment, ECF 1-1, Mirakl provided Greff with access to Mirakl's valuable Confidential Information and trade secrets.

19.     As an Education Expert at Mirakl, Greff held a positon of substantial responsibility and trust.  His professional responsibilities included, but were not limited to:

     a.     Leading Mirakl's training program for its team members, customers, and partners;

     b.     Developing Mirakl's training curriculum for onboarding new team members;

     c.     Training Mirakl customers and partners in the successful implementation and management of marketplaces using Mirakl;

     d.     Designing and applying assessment tools to measure training effectiveness;

     e.     Designing Mirakl training manuals; and

     f.     Tracking and reporting on Mirakl's training outcomes.

20.     On August 27, 2020, Greff informed Mirakl of his decision to resign. Greff resigned from Mirakl to commence employment in a similar role with VTEX but refused to disclose the name of his subsequent employer to Mirakl.

21.     Chang worked for Mirakl between July 2, 2018 and March 31, 2020 as Mirakl's Director of Sales, West Region.  Subject to the terms of the July 9, 2018 Mirakl Employee Assignment of Intellectual Property, Non-Compete and Confidentiality Agreement (the "Chang Agreement"), ECF 1-2, which was a condition of his employment, Mirakl provided Chang with access to Mirakl's valuable Confidential Information and trade secrets.

22.     As Mirakl's Director of Sales, West Region, Chang held a position of substantial responsibility and trust.  His job duties included, but were not limited to:

    a.    Defining a sales strategy to meet Mirakl's quarterly objectives;

    b.    Ensuring the success of each sales process by contributing to Mirakl's network and public visibility to expand Mirakl's reach in the marketplace;

    c.    Developing a client portfolio by developing new clients and expanding relationships with existing Mirakl clients;

    d.    Contributing to the North American sales division;

23.     After resigning from Mirakl, Chang commenced employment in a similar role with VTEX.

24.     Yee worked for Mirakl between April 30, 2018 and March 20, 2020 as Mirakl's Vice President Solution Engineering – Americas.

25.     Pursuant to the April 30, 2018 Mirakl Employee Assignment of Intellectual Property, Non-Compete and Confidentiality Agreement (the "Yee Agreement"), ECF Doc 1-5 , to which Yee agreed as a condition of his employment, Mirakl Company provided Yee with access to Mirakl's valuable Confidential Information and trade secrets.

26.     Yee held a position of substantial responsibility and trust.  His duties at Mirakl included, but were not limited to:

a.      Directing and managing Mirakl's solution engineering resources throughout the sales cycle;

b.      Joining Mirakl's Sales team on calls and meetings with Americas prospects to address technical questions and gather customer solution requirements;

c.      Identifying opportunities from conversations with prospects to find key drivers for the project to reach a faster close;

d.      Working with Mirakl's partners to define and scope solutions for joint customers;

e.      Managing Mirakl's existing team of Solution Engineers and determining plans for strategic team growth;

f.      Participating in account planning and strategy development with the Americas Sales Team;

g.      Engaging with Mirakl senior/executive leadership to ensure business unit objectives are met;

h.      Actively supporting the team's career development and advancement;

i.      Providing guidance to leadership on solution engineering strategy and platform obstacles/gaps;

j.      Using effective sales techniques to uncover customer needs that can be addressed through Mirakl's solutions; and

k.      Focusing on solution and value selling by highlighting what matters to the prospect and explaining how the platform solves the pain points.

27.     Yee commenced employment in a similar role with VTEX after his employment with Mirakl terminated.

28.     Brownell worked for Mirakl between October 22, 2018 and April 6, 2020.

29.     Brownell was a Senior Partner Sales Manager at Mirakl.

30.     Pursuant to the October 8, 2018 Mirakl Employee Assignment of Intellectual Property, Non-Compete and Confidentiality Agreement (the "Brownell Agreement"), ECF 1-7, that Brownell entered as a condition of his employment, Mirakl

provided Brownell with access to Mirakl's valuable Confidential Information and trade secrets.

31.     As Senior Partner Sales Manager at Mirakl, Brownell held a position of substantial responsibility and trust.  His duties included, but were not limited to:

a.      Leading the development of Mirakl's Partner Strategy for defined partners and territories;

b.      Managing revenue targets, marketing campaigns, and field engagement;

c.      Organizing and driving joint sales activities between Mirakl and its partners, including joint funnel management;

d.      Enabling sales and technical capability within the partners, collaborating with other functions within Mirakl;

e.      Driving and engaging Mirakl Sales teams to work on/support alliance partner opportunities;

f.      Engaging all levels of the partners' organizations – inspiring and influencing them to partner with Mirakl and deliver joint propositions;

g.      Developing shared business plans with key partners, collaborating with other functions within Mirakl;

h.      Ensuring that Mirakl's partners use implementation best practices and "team" with Mirakl on delivery; and

i.      Working closely with the North American Sales Team to drive a culture of joint interaction between direct sales and the partners.

32.     Brownell commenced employment in a similar role with VTEX after his separation from employment with Mirakl.

33.     Blanford worked as a Sales Executive for Mirakl between August 5, 2019 and April 6, 2020.

34.     Pursuant to the July 18, 2019 Mirakl Employee Assignment of Intellectual Property, Restrictive Covenant and Confidentiality Agreement (the "Blanford

Agreement"), ECF 1-6, which was a condition of his employment, Mirakl entrusted Blanford with Mirakl's valuable Confidential Information and trade secrets.

35.     As a Sales Executive at Mirakl, Blanford held a position of substantial responsibility and trust.  His job duties included, but were not limited to:

a.     Defining a sales strategy to meet quarterly objectives set by the Management Team;

b.     Identifying new business opportunities and targeting appropriate contacts;

c.     Establishing solid relationships with key stakeholders at the highest levels of an organization, particularly within the VP, EVP, and C-suite;

d.     Managing and leading the full sales process from contact to closing;

e.     Managing time and territory to maximize velocity and penetration with businesses;

f.     Contributing to developing Mirakl's network and public visibility to expand its reach in the marketplace; and

g.     Effectively managing prospect/client expectations.

36.     Blanford commenced employment in a similar role with VTEX after his separation from employment with Mirakl.

37.     Cochran worked for Mirakl between May 29, 2018 and February 12, 2020. He was a Senior Business Development Representative at Mirakl.  He executed a May 29, 2018 Mirakl Employee Assignment of Intellectual Property, Non-Compete and Confidentiality Agreement (the "Cochran Agreement") as a condition of his employment with Mirakl.  ECF 1-4.  Pursuant to the Cochran Agreement, Mirakl provided Cochran with access to Mirakl's valuable Confidential Information and trade secrets.

38.     As a Senior Business Development Representative, Cochran held a position of substantial trust and responsibility.  His job duties included, but were not limited to:

a.    Establishing, researching, and engaging enterprise-level prospects within his territory;

b.    Actively managing a portfolio of prospects and contacts in Salesforce and setting up nurturing activities to generate active engagement with prospects;

c.    Working cross-functionally with the Marketing Team to intensify inbound leads and outbound prospecting efforts;

d.    Setting up comprehensive prospecting approaches (1:1 account management, outbound campaigns, etc.), including emails and calls;

e.    Creating relevant and impactful content in email correspondence with decision-makers in prospect organizations;

f.    Providing comprehensive and clear briefs to the Sales Execs when an opportunity is transferred;

g.    Being the expert in his territory understanding key players, opportunities, market trends, and challenges; and

h.    Supporting the Sales Execs in creating presentations by providing key insights into areas of development and potential roadblocks.

39.    Cochran commenced employment in a similar role with VTEX after working for Mirakl.

40.    Lee worked for Mirakl as the Company's Executive Vice President of Sales – Americas between February 1, 2018 and September 3, 2019 and as Mirakl's Executive Vice President of Sales – APAC between September 2019 and March 2, 2020.

41.    Pursuant to the February 1, 2018 Mirakl Employee Assignment of Intellectual Property, Non-Compete and Confidentiality Agreement (the "Lee Agreement"), ECF 1-3, that Lee entered as a condition of his employment, Mirakl provided him with access to Mirakl's valuable Confidential Information and trade secrets.

42.    At all times, Lee held positions of substantial trust and responsibility with Mirakl.

43.     As Mirakl's Executive Vice President Sales Americas, Lee's duties included: developing the Americas territory from a sales perspective by engaging with prospective clients and partners to help close deals and achieve quota target; enabling the Americas sales organization to meet and exceed their sales targets; managing the existing team and onboarding and developing new hires; building strategic account lists and a territory plan for the Americas region; and working cross-functionally with Marketing and Alliances to develop strategies on events, lead generation, customer marketing, partner sales, partner marketing, and partner strategy to positively influence the Americas sales pipeline.

44.     As Mirakl's Executive Vice President – APAC, Lee's duties included developing out the APAC territory from a sales perspective; engaging with prospective clients and partners to close deals and achieve quota targets; building strategic account lists and a territory plan for the APAC region; and working cross-functionally with Marketing and Alliances to develop strategies on events, lead generation, customer marketing, partner sales, partner marketing, and partner strategy to positively influence the APAC sales pipeline.

45.     Lee commenced employment in a similar role with VTEX after his separation from employment with Mirakl.

### Mirakl Took Reasonable Measures to Protect Its Confidential Information

46.     Mirakl took (and continues to take) reasonable measures to keep its Confidential Information, Proprietary Information, and trade secrets confidential by, among other things: (1) requiring employees who have access to such information to sign confidentiality agreements, (2) promulgating confidentiality and information security policies, (3) taking reasonable measures to limit the disclosure and distribution of such

information to only a small number of employees on a need-to-know basis, (4) requiring that such information be saved on password-protected networks or servers, and/or (5) utilizing non-disclosure agreements when engaging in discussions with customers, prospective customers, partners, and other third parties.

47.     As defined in their written agreements with Mirakl and as more fully detailed below, each of the Individual Defendants agreed to protect the confidentiality of Mirakl's Proprietary Information and trade secrets as a contention of his employment with Mirakl (*e.g., infra* at ¶¶ 48-60).  VTEX has (and has had) actual knowledge of the obligations that the Individual Defendants owe to Mirakl.

48.     As a condition of his employment with Mirakl, and pursuant to the Greff Agreement, Greff agreed to protect and safeguard Mirakl's Confidential Information. Specifically, the Greff Agreement provides, in relevant part:

> [Mirakl's] Confidential and Trade Secrets constitute valuable assets of the Company, and may not be converted to Employee's own use, or otherwise used by any other person or entity.  According, Employee hereby agrees that throughout the Employment Period and at all times after [his] employment terminates, for so long as the information at issue remains either Confidential Information or a Trade Secret, employee will not, directly or indirectly, reveal, divulge, or disclose to any person or entity not expressly authorized by the Company any Confidential Information or Trade Secrets and will not, directly or indirectly, replicate, duplicate, transfer to [himself], use or make use of any Confidential Information or Trade Secrets in connection with any activity, or for any purpose whatsoever, other than for authorized business activities performed on behalf of the Company.

Greff Agreement, ECF 1-1, ¶ 4(a).

49.     Pursuant to the Greff Agreement, the phrase "Confidential Information" includes, but is not limited to:

> all information, ideas and materials of or about company and/or its affiliates, employees, prospects or customers that are not generally known

to the public, including, without limitation information, ideas or materials relating to methods or technology, trademarks, trade secrets, patents, copyrights or any other proprietary or intellectual property rights, products, processes include, employees, finances technology, methods, algorithms, software, code, contact, clients, prospects, customers, customer information (including, but not limited to, names, phone numbers, addresses, e-mail addresses, order history, order preferences, chain of command, pricing information and other information identifying facts and circumstances specific to the customer and relevant to sales/services), strategy and other business or technical matters, information relating directly or indirectly to business processes, practices, methods, policies, plans, documents, operations, services, strategies, techniques, agreements, contracts, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer software, applications, operating systems, software design, work-in-process, databases, vendor information, financial information, accounting information, legal information, marketing information, pricing information, staffing information, personnel information, employee lists, vendor lists, customer information and customer lists (including prospective customer information analyst), supplier information, marketing materials, advertising materials, business plans.

*Id.*at ¶ 1.

50.     Greff further agreed,

During Employee's employment and for a period of 12 months after Employee is no longer employed by the Company, the Employee agrees and covenants not to, directly or indirectly, whether on her/his own behalf or on behalf of any other person or entity, do any of the following with respect to Protected Employees and/or Contractors: solicit, hire, recruit, attempt to hire or recruit; assist in the solicitation, hiring, or recruitment of; encouraged to leave or reduce the amount of employment or services provided to the Company, or otherwise interfere with contractual relations or prospective contractual relations with Company.

During Employee's employment and for a period of 24 months after Employee is no longer employed by the Company, the Employee agrees and covenants not to, directly or indirectly, whether on her/his own behalf or on behalf of any other person or entity other than the Company, do any of the following with respect to protected customers: solicit, divert, take away (from the Company); attempt to solicit, divert or take away (from the Company); perform services on behalf of; encourage or assist to terminate or reduce the amount of services provided by the Company; meet or communicate with for purposes of offering goods or services similar to or competitive with those offered by the Company; or otherwise

interfere with contractual relations or prospective contractual relations with the Company.

Greff Agreement, ECF 1-1, at ¶ 4(b)-(c).

51.     As a condition of his employment with Mirakl and pursuant to the Chang Agreement, Chang acknowledged and agreed:

> Employee understands that Employee's work will involve access to and creation of confidential, proprietary and secret information (collectively, Proprietary Information"). Employee agrees to keep all Proprietary Information in trust for the sole benefit of the Company. Employee will not use or disclose and Proprietary Information, except as required by Employee's duties to Company, even after termination of Employee's employment.  Proprietary Information includes information, ideas and materials of or about Company and/or its affiliates, employees, prospects or customers that are not generally known to the public, including, without limitation information, ideas or materials relating to methods or technology, trademarks, trade secrets, patent, copyrights, or any other proprietary or intellectual property rights, products, processes, employees finances, technology, methods, algorithms, software, code, contacts, clients, prospects, customer, strategy and other business or technical matters.

Chang Agreement, ECF 1-2, at ¶ 1.

52.     As a condition of his employment with Mirakl and pursuant to the Lee Agreement, Lee agreed to the same confidentiality restrictions agreed to by Chang.  Lee Agreement, ECF 1-3, at ¶ 1.

53.     Chang and Lee further agreed that "upon termination of Employee's employment with Company, or at any time if it so requests, Employee will deliver immediately to Company all property belonging to Company and all material containing Proprietary Information, ***including any copies***, in Employee's possession or control, whether prepared by Employee or others."  Chang Agreement, ECF 1-2, at ¶ 3 (emphasis added); Lee Agreement, ECF 1-3, at ¶ (emphasis added).

54.     Neither Lee nor Chang complied with his agreement to return to Mirakl all of its trade secrets, Confidential Information, and Proprietary Information.

55.     As a condition of his employment with Mirakl and pursuant to the terms of the Cochran Agreement, Cochran agreed:

> (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow it to be disclosed, published, communicated or made available, in whole or part, to any entity or person whatsoever not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the company; and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of the Company, except as required in the performance of any of the Employee's remaining authorized employment duties to the Company or with the prior consent of an authorized officer acting on behalf of the Company in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

Cochran Agreement, ECF 1-4, at ¶ 1.

56.     Cochran further agreed that he would, for a 12-month period following the termination of his employment, refrain from soliciting Mirakl employees and Protected Customers.  Cochran Agreement, ECF 1-4, at ¶ 4(b)-(c).

57.     As a condition of his employment with Mirakl and pursuant to the Yee Agreement, Yee agreed to the same confidentiality and non-solicitation restrictions agreed to by each Greff and Cochran.  Yee Agreement, ECF 1-5, at ¶ 1, 4(a)-(c).

58.     As a condition of his employment with Mirakl and pursuant to the Blanford Agreement, Blanford acknowledged and agreed to the same confidentiality and non-solicitation restrictions agreed to by each Greff, Cochran, and Yee.   Blanford Agreement, ECF 1-6, at ¶ 1, 4(a)-(c).

59.     As a condition of his employment with Mirakl, and upon execution of the February 17, 2019 Mirakl Employee Assignment of Intellectual Property, Restrictive Covenant and Confidentiality Agreement ("Brownell Agreement") between Brownell and Mirakl, Brownell acknowledged and agreed to the same confidentiality and non-solicitation restrictions agreed to by each Greff, Cochran, Yee, and Blanford.  Brownell Agreement, ECF 1-7, at ¶ 1, 4(a)-(c).

60.     Yee, Greff, Cochran, Blanford, and Brownell each also agreed,

> s/he will not retain or destroy, and will immediately return to the Company on or prior to her last day of employment, or at any other time the Company requests such return, any and all property of the Company that is in her/his possession or subject to his/her control including, but not limited to, keys, credit and identification cards, equipment, client files and information, and all Confidential Information and Trade Secrets. Employee will not make, distribute or retain copies of any such information or property.  Employee agrees that s/he will reimburse the Company for all of its costs, including reasonable attorneys' fees, of recovering the above materials and otherwise enforcing compliance with this provision if s/he does not return the materials in compliance with this provision.

Greff Agreement, ECF 1-1, at ¶ 3; Cochran Agreement, ECF 1-4, ¶ 3; Yee Agreement, ECF 1-5, at ¶ 3; Blanford Agreement, ECF 1-6, at ¶ 3; Brownell, ECF 1-7, at ¶ 3.

61.     During their respective periods of employment with Mirakl, Mirakl entrusted each of the Individual Defendants with regular access to Mirakl's Confidential Information, Proprietary Information, and trade secrets because such access was necessary for each of the Individual Defendants to perform their respective job duties at Mirakl.

62.     Mirakl has invested and continues to invest substantial time, money, and other resources in developing and preserving its trade secrets, Confidential Information,

Proprietary Information, and its relationships with its customers, potential customers, employees, partners, and vendors.

63.     Mirakl rigorously protects its trade secrets, Confidential Information, and Proprietary Information because they provide Mirakl with a competitive advantage in the interstate and international marketplace from which Mirakl derives economic value.

64.     Mirakl's trade secret information is sufficiently secret to derive independent economic value due to not being generally known to, and being not readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure and use, such as Mirakl's competitors (including, but not limited to, VTEX).

65.     The protective measures that Mirakl applies include, but are not limited to, requiring that its employees execute confidentiality agreements, participate in Mirakl's IT security training program, and comply with, among others, Mirakl's password, mobile device work, and other IT protection policies.

66.     At all times during their employment with Mirakl, the Individual Defendants were aware of, and had been made aware of, the confidential nature of the Mirakl information to which they were exposed.  Moreover, the Individual Defendants were aware of the many measures that Mirakl undertook to safeguard the confidentiality of the information and to prevent the disclosure of confidential or trade secret information.

67.     Mirakl has invested many years of work and millions of dollars in attaining and developing its confidential information, and it has implemented a number of

limitations on access to that information to maintain its confidentiality and to prevent its disclosure or release.

68.     Access to Mirakl's computer networks is, and at all relevant times was, restricted to Mirakl employees provided with a network access password.

69.     Certain confidential Mirakl information – including customer preference information – is, and at all relevant times was, protected from disclosure or release by restricting access, even within Mirakl, to those Mirakl employees who needed to have access to that information as part of their jobs.

70.     Physical access to Mirakl's offices is, and at all relevant times was, restricted to those employees who can present a valid keycard.

71.     Mirakl also guards its Confidential Information, Proprietary Information, and trade secrets through practices that limit the circumstances under which sensitive information may be transmitted to outside organizations and agencies with which Mirakl conducts business.  For example, before allowing customers (or any third party) access to confidential or proprietary information processes, Mirakl requires (and at all relevant times has required) that the customers sign a non-disclosure agreement mandating that the information be maintained as confidential and not disclosed or used.

72.     In addition, each of Mirakl's Master Services Agreements with its customers includes similar non-disclosure requirements.

73.     Mirakl databases that contain especially sensitive information are protected through multiple layers of security and can be accessed only by individuals who have received special authorization and login credentials.

74.     The aforementioned methods of protecting the integrity of Mirakl's trade secrets and the secrecy of its Confidential and Proprietary Information are common in the marketplace software industry.   VTEX is familiar with and applies such protective measures itself.

75.     By way of example only, since at least 2015, VTEX has required that its employees, customers, and other third parties take measures to prevent the use, disclosure, dissemination or copying of any confidential information; limit the use of confidential information to that necessary to accomplish VTEX's objectives, and obtain from employees, agents and contracting parties agreement to comply with VTEX's restrictions relating to confidential information.   Thus, when VTEX recruited and hired the Individual Defendants, VTEX had actual knowledge that the Individual Defendants owed Mirakl a duty to protect Mirakl's trade secrets, Confidential Information, and Proprietary Information.

76.     Moreover, by April 13, 2020 – at the very latest – VTEX had actual knowledge of the specific content of the post-employment restrictions on the conduct of the Individual Defendants.   On April 13, 2020, VTEX's counsel in this action had replied to Mirakl's April 6, 2020 correspondence, which included a copy of the Yee Agreement and demanded that Yee cease and desist his breaches thereof.

77.     Despite actual knowledge of the post-employment restrictions to which Greff had agreed, VTEX hired Greff in August 2020.

## The Individual Defendants Violated Their Contractual
## Obligations to Mirakl Before and After Their Employment Ended

### Misappropriation of Confidential Information

78.     Greff notified Mirakl on August 27, 2020 that he was resigning his employment with Mirakl.

79.     Greff's last day of employment with Mirakl was September 1, 2020.  He resigned from Mirakl to commence employment with VTEX.

80.     On September 1, 2020, and for nearly a month thereafter, Greff refused to disclose to Mirakl the passwords he had used to access the Mirakl-owned iPhone that he used while working for Mirakl (the "Greff iPhone") and his Mirakl-issued MacBook laptop ("Greff MacBook").

81.     Greff used the Greff MacBook and Greff iPhone in interstate commerce and communication, including to access email accounts for purposes of communicating Mirakl business over the internet and to access Mirakl's servers for purposes of maintaining information regarding numerous customers and/or customer locations with which Mirakl was engaged in interstate and/or international commerce.  These protected computers were equipped with Ethernet cards and/or access to mobile communications networks and a remote service router, and Greff routinely used them to access to Mirakl's servers through a password-protected interstate connection.

82.     Although Greff initially refused to disclose the password to the Greff MacBook, Mirakl was able to utilize an administrative account to gain access and have a forensic expert conduct an analysis of the Greff MacBook.

83.     A forensic analysis of the Greff MacBook revealed that, on August 12 and 13, 2020, *after* Greff had interviewed for a job with VTEX , Greff used his home network

to download from the Greff Laptop hundreds of confidential Mirakl files to one or more computers or storage locations where Greff was not authorized to use, to store, or to access Mirakl's trade secrets or Confidential Information.

84.     In the short period between July 31, 2020 and September 1, 2020, Greff conducted over 15,812 downloads of Mirakl trade secrets and Confidential Information.

85.     When Greff downloaded Mirakl trade secrets and confidential information, he was in the process of obtaining and accepting, or already had accepted, an employment offer of employment from VTEX.

86.     When VTEX hired Greff in August 2020, VTEX had actual knowledge of the post-employment confidentiality and nonsolicitation obligations applicable to Mirakl employees.  With this knowledge, VTEX hired Greff to perform a job similar to the one he performed at Mirakl, and VTEX did so with knowledge that Greff inevitably would use or disclose Mirakl's trade secrets and confidential information by working for VTEX. VTEX hired Greff with the intent of acquiring Mirakl's trade secrets and confidential information with improper motive and through improper means.  Thus, VTEX has improperly acquired Mirakl's trade secrets and confidential information and interfered with Greff's contractual obligations to Mirakl.

87.     Greff misappropriated Mirakl's trade secrets in a willful manner and with a deliberate intent to injure Mirakl and improve his own financial gain, by among other things, inevitably using or disclosing Mirakl's trade secrets and confidential information in the course of performing his work at VTEX.

88.     When Greff downloaded Mirakl's files without authorization he acquired Mirakl trade secrets and Confidential and Proprietary Information that goes to the heart

of Mirakl's business and is of independent economic value. This information includes, but is not limited to:

 a. Mirakl's trade secret Application Programming Interface ("API") zip file, which included, among other things, all of the information one of Mirakl's competitors would need to rebuild the Mirakl platform;

 b. Tangible financial and business information such as customer documentation (including, but not limited to, customer briefs, customer goals, plans, and challenges, customer complaints and Mirakl's responses to same, customer data, including details regarding growth initiatives, sales numbers, and projected growth);

 c. Notes from meetings between Mirakl representatives and Mirakl's customers executive leadership;

 d. Commercial data relating to operational workshops; and

 e. Commercial, contractual, and gross merchandise value information relating to Mirakl's projected growth through 2020.

89. Greff's unauthorized downloads contain Mirakl trade secrets that relate to services that Mirakl provides in interstate and foreign commerce.

90. Greff had no legitimate business reason to download any of the files because the files were stored on Mirakl's servers and Greff had access to those servers to use the files for legitimate business purposes.

91. In downloading from Mirakl's protected computers files that contain Mirakl's trade secrets and confidential information, Greff willfully misappropriated Mirakl's confidential information, exceeded his authorized access to Mirakl's protected computers, and improperly acquired Mirakl's trade secrets with a deliberate intent to injure Mirakl and improve his own financial gain.

92. Greff also failed to comply with his contractual obligation to return to Mirakl all copies of all Mirakl trade secrets and confidential information.

93.     Brownell resigned from Mirakl effective April 6, 2020 to commence employment with VTEX.  In the month before his resignation became effective, he conducted multiple downloads of files that contain Mirakl trade secrets and confidential information for personal use.  At that time, he was in the process of obtaining and accepting, or already had obtained and accepted, an offer of employment from VTEX.  In doing so, he misappropriated Mirakl's trade secrets in a willful manner and with a deliberate intent to injure Mirakl and improve his own financial gain, by among other things, inevitably using or disclosing Mirakl's trade secrets and confidential information in the course of performing his work at VTEX.

94.     During his employment, Mirakl provided Brownell with the use of a Mirakl laptop computer (the "Brownell Laptop") and access to Mirakl's Google Drive. The Brownell Laptop and Mirakl's Google Drive were used in interstate commerce and communication, including to email accounts for purposes of communicating Mirakl business over the internet and to access Mirakl's servers for purposes of maintaining information regarding numerous customers and/or customer locations with which Mirakl was engaged in interstate and/or international commerce.  These devices were equipped with Ethernet cards and/or access to mobile communications networks and a remote service router, and Brownell routinely used them to access to Mirakl's servers through a password-protected interstate connection.

95.     Before separating from Mirakl, Brownell conducted over 600 downloads of 122 uniquely named files from Mirakl protected computers to one or more devices associated with more than 10 unique gateway IP addresses.

96.    At that time, Brownell was in the process of obtaining and accepting, or already had obtained and accepted, an offer of employment from VTEX.  In doing so, he misappropriated Mirakl's trade secrets in a willful manner and with a deliberate intent to injure Mirakl and improve his own financial gain, by among other things, inevitably using or disclosing Mirakl's trade secrets and confidential information in the course of performing his work at VTEX.

97.    Brownell used his home network to download from the Brownell Laptop more than 100 confidential Mirakl files to one or more computers or storage locations where he was not authorized to use, to store, or to access Mirakl's trade secrets or Confidential Information.  When Brownell downloaded Mirakl's files without authorization, he acquired Mirakl trade secrets and Confidential and Proprietary Information that goes to the heart of Mirakl's business and is of independent economic value.  The trade secrets and Confidential Information that Brownell acquired include, but are not limited to:

  a.  A Mirakl prospective customer pipeline report that includes confidential notes relating to account opportunities Mirakl actively is pursuing with a partner; and

  b.  A list of prospective customers with which Mirakl is actively engaged that includes (i) the technology partner with which each of those prospective customers currently works, (ii) notes on Mirakl's discussions to date with each of the identified potential customers, and (iii) information regarding whether the opportunities are in Mirakl's sales pipeline for June 2020.

98.    Brownell's unauthorized downloads contain trade secrets that relate to Mirakl services that are used in interstate and foreign commerce.

99.     Brownell had no legitimate business reason to download any of the files because the files were stored on Mirakl's servers and Brownell had access to those servers to use for legitimate business purposes.

100.     In downloading from Mirakl's protected computers files that contain Mirakl's trade secrets and confidential information, Brownell willfully misappropriated Mirakl's confidential information, exceeded his authorized access to Mirakl's protected computers, and improperly acquired Mirakl's trade secrets with a deliberate intent to injure Mirakl and improve his own financial gain.

101.     In addition, Brownell failed to comply with his contractual obligation to return to Mirakl all copies of all Mirakl trade secrets and confidential information.

102.     When VTEX hired Brownell, VTEX knew that Mirakl, like VTEX and other employers in the industry, required that its employees agree to post-employment confidentiality obligations and trade secret protections.  Despite this knowledge, VTEX hired Brownell to perform a job similar to the one he performed at Mirakl, and VTEX did so with knowledge that Brownell inevitably would use or disclose Mirakl's trade secrets and confidential information by working for VTEX.  VTEX hired Brownell with the intent of acquiring Mirakl's trade secrets and confidential information with improper motive and through improper means.  Thus, VTEX has improperly acquired Mirakl's trade secrets and confidential information and interfered with Brownell's contractual obligations to Mirakl.

103.     Cochran's employment with Mirakl terminated effective February 12, 2020.  Before February 12, Cochran conducted 1,247 downloads of 73 uniquely named

files to one or more devices on the networks associated with 26 unique gateway IP addresses.

104.   When Cochran was in the process of obtaining and accepting, or already had obtained and accepted, an offer of employment from VTEX, he was downloading trade secrets and Confidential Information from Mirakl's protected computers.  In doing so, he misappropriated Mirakl's trade secrets in a willful manner and with a deliberate intent to injure Mirakl and improve his own financial gain, by among other things, inevitably using or disclosing Mirakl's trade secrets and confidential information in the course of performing his work at VTEX.

105.   In downloading from Mirakl's protected computers files that contain Mirakl's trade secrets and confidential information, Cochran willfully misappropriated Mirakl's Confidential Information, exceeded his authorized access to Mirakl's protected computers, and improperly acquired Mirakl's trade secrets with a deliberate intent to injure Mirakl and improve his own financial gain.

106.   During his employment, Mirakl provided Cochran with the use of a Mirakl laptop computer (the "Cochran Laptop") and access to Mirakl's Google Drive.  Cochran used the Cochran Laptop and Mirakl's Google Drive in interstate commerce and communication, including to access email accounts for purposes of communicating Mirakl business over the internet and to access Mirakl's servers for purposes of maintaining information regarding numerous customers and/or customer locations with which Mirakl was engaged in interstate and/or international commerce. The Cochran Laptop was equipped with Ethernet cards and/or access to mobile communications

networks and a remote service router, and Cochran routinely used it to access to Mirakl's servers through a password-protected interstate connection.

107.    Cochran used his home network to download from the Cochran Laptop confidential Mirakl files to one or more computers or storage locations where he was not authorized to use, to store, or to access Mirakl's trade secrets and Confidential Information.

108.    When Cochran downloaded Mirakl's files without authorization, he acquired Mirakl trade secrets and confidential and proprietary Mirakl business information that goes to the heart of Mirakl's business and is of independent economic value.  The trade secrets and Confidential Information that he acquired include, but are not limited to:

   a.    Notes from a call with a customer prospect that (i) include details on the prospective customer's interest in a marketplace solution and (ii) identify the prospective customer's key decision makers;

   b.    Names, titles, emails, and phone numbers of prospective customers who attended an event Mirakl attended (NRF 2020);

   c.    A sales overview for the central region including Mirakl's key prospective customers and partners, including notes of conversations Mirakl has had with these prospective customers and partners and details relating to the types of eCommerce technology those prospects currently use; and

   d.    A summary of Mirakl's prospective customers that includes key contacts, industry insights, key business initiatives for 2020, and activity notes detailing the conversations Mirakl employees have had with Mirakl's customer prospects.

109.    The trade secrets that Cochran downloaded were related to Mirakl services that are used in interstate and foreign commerce.

110.    Cochran had no legitimate business reason to download any of the files because the files were stored on Mirakl's servers and Cochran had access to those servers to use the files for legitimate business purposes.

111.    In downloading from Mirakl's protected computers files that contain Mirakl's trade secrets and confidential information, Cochran willfully misappropriated Mirakl's confidential information, exceeded his authorized access to Mirakl's protected computers, and improperly acquired Mirakl's trade secrets with a deliberate intent to injure Mirakl and improve his own financial gain.

112.    Cochran also failed to comply with his contractual obligation to return to Mirakl all copies of all Mirakl trade secrets and confidential information.

113.    When VTEX hired Cochran, VTEX knew that Mirakl, like VTEX and other employers in the industry, required that its employees agree to post-employment confidentiality obligations and trade secret protections.  Despite this knowledge, VTEX hired Cochran to perform a job similar to the one he performed at Mirakl, and VTEX did so with knowledge that Cochran inevitably would use or disclose Mirakl's trade secrets and confidential information by working for VTEX.  VTEX hired Cochran with the intent of acquiring Mirakl's trade secrets and confidential information with improper motive and through improper means.  Thus, VTEX has improperly acquired Mirakl's trade secrets and confidential information and interfered with Cochran's contractual obligations to Mirakl.

114.    Chang resigned from Mirakl effective March 31, 2020 to commence employment with VTEX.  In the month before his resignation became effective, Chang

downloaded numerous files that contained Mirakl's trade secrets and Confidential Information.

115.    When Chang downloaded Mirakl's files, he misappropriated Mirakl's trade secrets in a willful manner and with a deliberate intent to injure Mirakl and improve his own financial gain, by among other things, inevitably using or disclosing Mirakl's trade secrets and Confidential Information in the course of performing his work at VTEX.

116.    During his employment, Mirakl provided Chang with the use of a Mirakl laptop computer (the "Chang Laptop") and access to Mirakl's Google Drive. The Chang Laptop and Mirakl's Google Drive were used in interstate commerce and communication, including to access email accounts for purposes of communicating Mirakl business over the internet and to access Mirakl's servers for purposes of maintaining information regarding numerous customers and/or customer locations with which Mirakl was engaged in interstate and/or international commerce. The Chang Laptop was equipped with Ethernet cards and/or access to mobile communications networks and a remote service router, and Chang routinely accessed Mirakl's servers through a password-protected interstate connection.

117.    Chang used his home network to download from the Chang Laptop to one or more unauthorized locations hundreds of confidential Mirakl files to a computer or other device capable of performing computing and/or storage functions that Mirakl does not own and where Chang was not authorized to use, to store, or to access Mirakl's Confidential Information.

118.    Before separating from Mirakl, Chang conducted nearly 1,100 downloads of 105 uniquely named files to one or more devices on the networks associated with more than 10 unique gateway IP addresses.

119.    At that time, Chang was in the process of obtaining and accepting, or already had obtained and accepted, an offer of employment from VTEX.  In doing so, he misappropriated Mirakl's trade secrets in a willful manner and with a deliberate intent to injure Mirakl and improve his own financial gain, by among other things, inevitably using or disclosing Mirakl's trade secrets and confidential information in the course of performing his work at VTEX.

120.    Chang used his home network to download from the Chang Laptop more than 100 confidential Mirakl files to one or more computers or storage locations where he was not authorized to use, to store, or to access Mirakl's Confidential Information.  When Chang downloaded Mirakl's files without authorization, he acquired Mirakl trade secrets and Confidential and Proprietary Information that goes to the heart of Mirakl's business and is of independent economic value.  The trade secrets and Confidential Information that he acquired includes, but is not limited to:

    a.    A file that contains customer-specific pricing information for a current Mirakl client;

    b.    A file relating to 30 separate prospect meetings that occurred during a Mirakl event that includes details regarding the extent to which each prospect is interested in a marketplace; and

    c.    A confidential sales presentation provided to a Mirakl client.

121.    Chang's unauthorized downloads contain trade secrets that relate to Mirakl services that are used in interstate and foreign commerce.

122.     Chang had no legitimate business reason to download any of the files because the files were stored on Mirakl's servers and Chang had access to those servers to use for legitimate business purposes.

123.     In downloading from Mirakl's protected computers files that contain Mirakl's trade secrets and confidential information, Chang willfully misappropriated Mirakl's confidential information, exceeded his authorized access to Mirakl's protected computers, and improperly acquired Mirakl's trade secrets with a deliberate intent to injure Mirakl and improve his own financial gain.

124.     Chang also failed to comply with his contractual obligation to return to Mirakl all copies of all Mirakl trade secrets and confidential information.

125.     When VTEX hired Chang, VTEX knew that Mirakl, like VTEX and other employers in the industry, required that its employees agree to post-employment confidentiality obligations and trade secret protections.  Despite this knowledge, VTEX hired Chang to perform a job similar to the one he performed at Mirakl, and VTEX did so with knowledge that Chang inevitably would use or disclose Mirakl's trade secrets and confidential information by working for VTEX.  VTEX hired Chang with the intent of acquiring Mirakl's trade secrets and confidential information with improper motive and through improper means.  Thus, VTEX has improperly acquired Mirakl's trade secrets and confidential information and interfered with Chang's contractual obligations to Mirakl.

126.     In addition, a forensic analysis of the Chang Laptop revealed that before returning Mirakl's device, Chang intentionally destroyed all evidence of his activity on the device.  More specifically, the system's ability to recognize disc partitions, directory

structures and other artifacts necessary even to boot or start the system was destroyed before Chang returned it to Mirakl.

127.  Chang so completely wiped the contents of the disc, that he eliminated all data previously contained on the system that if one were to attempt to boot the system, it would not even recognize the file system.

128.  In destroying the system before returning the Chang Laptop, Chang intentionally destroyed evidence relevant to Mirakl's claims against him and engaged in destructive conduct with knowledge of and the intent to conceal his misappropriation of Mirakl's trade secrets and confidential information.

129.  Yee resigned from Mirakl effective March 20, 2020 to commence employment with VTEX.  On March 19 alone, Yee conducted over 350 downloads of files that contained Mirakl trade secrets and confidential information.

130.  At that time, Yee was in the process of obtaining and accepting, or already had obtained and accepted, an offer of employment from VTEX.  In doing so, he misappropriated Mirakl's trade secrets in a willful manner and with a deliberate intent to injure Mirakl and improve his own financial gain, by among other things, inevitably using or disclosing Mirakl's trade secrets and confidential information in the course of performing his work at VTEX.

131.  When Yee downloaded Mirakl's files, he misappropriated Mirakl's trade secrets in a willful manner and with a deliberate intent to injure Mirakl and improve his own financial gain, by among other things, inevitably using or disclosing Mirakl's trade secrets and Confidential Information in the course of performing his job at VTEX.

132.    During his employment, Mirakl provided Yee with the use of a Mirakl laptop computer (the "Yee Laptop") and access to Mirakl's Google Drive.  The Yee Laptop and Mirakl's Google Drive were used in interstate commerce and communication, including for accessing email accounts for purposes of communicating Mirakl business over the internet and for accessing Mirakl's servers for purposes of maintaining information regarding numerous customers and/or customer locations with which Mirakl was engaged in interstate and/or international commerce.  The Yee Laptop was equipped with Ethernet cards and/or access to mobile communications networks and a remote service router, and Yee routinely accessed Mirakl's servers through a password-protected interstate connection.

133.    Yee used his home network to download from the Yee Laptop nearly 500 confidential Mirakl files to one or more computers or storage locations where Yee was not authorized to use, to store, or to access Mirakl's Confidential Information.

134.    Before separating from Mirakl, Yee conducted over 1,600 downloads of 491 uniquely named files to one or more devices on the networks associated with more than 85 unique gateway IP addresses.

135.    When Yee downloaded Mirakl's files without authorization, he acquired Mirakl trade secrets and Confidential and Proprietary Information that goes to the heart of Mirakl's business and is of independent economic value.  The trade secrets and Confidential Information that he acquired includes, but is not limited to:

    a.      Resume of a now former Mirakl employee (Taner Bayram);

    b.      A detailed map of different ecommerce systems a current Mirakl customer uses and how Mirakl's platform is integrated with those systems, which architecture diagrams could be used by a competitor to understand how Mirakl works with a specific customer and where a Mirakl competitor

(such as VTEX) may be able to exploit an advantage in connecting their system into the Mirakl customer's technology ecosystem;

c.     Notes of a meeting with an existing Mirakl customer that detail that client's future plans to use different features of the Mirakl platform;

d.     A detailed map of different ecommerce systems another Mirakl customer uses and how Mirakl's platform plugs in, which architecture diagrams could be used by a competitor to understand how Mirakl works with that specific customer and where a competitor (such as VTEX) may have an advantage in connecting their system into the Mirakl customer's technology ecosystem;

e.     Key pieces of information relating to a current customer, which includes but is not limited to that customer's timeline of how they implemented Mirakl starting from 2018 through to the end of 2020, the Mirakl features and functionality that customer uses, architecture diagrams that show how Mirakl's system connects in with that customer's ecommerce platform, and any strategic discussions Mirakl has had with the customer; and

f.     The 449-page slide deck of Mirakl's software engineering team that which includes key business decisions relating to features Mirakl is likely to develop and features Mirakl may need to strengthen.

136.    Yee's unauthorized downloads contain trade secrets that relate to Mirakl services that are used in interstate and foreign commerce.

137.    Yee had no legitimate business reason to download any of the files because the files were stored on Mirakl's servers and Yee had access to those servers to use for legitimate business purposes.

138.    In downloading from Mirakl's protected computers files that contain Mirakl's trade secrets and confidential information, Yee willfully misappropriated Mirakl's confidential information, exceeded his authorized access to Mirakl's protected computers, and improperly acquired Mirakl's trade secrets with a deliberate intent to injure Mirakl and improve his own financial gain.

139.    Yee also failed to comply with his contractual obligation to return to Mirakl all copies of all Mirakl trade secrets and confidential information.

140.    When VTEX hired Yee, VTEX knew that Mirakl, like VTEX and other employers in the industry, required that its employees agree to post-employment confidentiality obligations and trade secret protections.  Despite this knowledge, VTEX hired Yee to perform a job similar to the one he performed at Mirakl, and VTEX did so with knowledge that Yee inevitably would use or disclose Mirakl's trade secrets and confidential information by working for VTEX.  VTEX hired Yee with the intent of acquiring Mirakl's trade secrets and confidential information with improper motive and through improper means.  Thus, VTEX has improperly acquired Mirakl's trade secrets and confidential information and interfered with Yee's contractual obligations to Mirakl.

141.    Lee resigned from Mirakl effective March 2, 2020 to commence employment with VTEX.  Between January 22, 2020 and March 2, 2020, Lee conducted numerous downloads of files that contained Mirakl trade secrets and confidential information.

142.    At that time, Lee was in the process of obtaining and accepting, or already had obtained and accepted, an offer of employment from VTEX.  In doing so, he misappropriated Mirakl's trade secrets in a willful manner and with a deliberate intent to injure Mirakl and improve his own financial gain, by among other things, inevitably using or disclosing Mirakl's trade secrets and confidential information in the course of performing his work at VTEX.

143.    During his employment, Mirakl provided Lee with the use of a Mirakl laptop computer (the "Lee Laptop") and access to Mirakl's Google Drive.  Lee used the Lee Laptop and Mirakl's Google Drive in interstate commerce and communication, including to access email accounts for purposes of communicating Mirakl business over

the internet and to access Mirakl's servers for purposes of maintaining information regarding numerous customers and/or customer locations with which Mirakl was engaged in interstate and/or international commerce.  The Lee Laptop was equipped with Ethernet cards and/or access to mobile communications networks and a remote service router, and Lee routinely accessed Mirakl's servers through a password-protected interstate connection.

144.    While working for Mirakl, Lee used his home network to download from the Lee Laptop more than 60 confidential Mirakl files to one or more storage locations where Lee was not authorized to use, to store, or to access Mirakl's Confidential Information.

145.    Before separating from Mirakl, Lee conducted 160 downloads of 61 uniquely named files to one or more devices on the networks associated with more than 25 unique gateway IP addresses.

146.    When Lee downloaded Mirakl's files without authorization, he acquired Mirakl trade secrets and Confidential and Proprietary Information that goes to the heart of Mirakl's business and is of independent economic value.  The trade secrets and Confidential Information that he acquired includes, but is not limited to:

a.    A Mirakl list of prospects and key contacts inside each prospect organization, including emails;

b.    Slides from an internal leadership meeting that Mirakl held in 2020, with confidential information about Mirakl's hiring goals and operating costs;

c.    Pricing information relating to how Mirakl priced its solution with 14 international customers; and

d.    Mirakl's 2019 template for pitch decks the Company uses when preparing presentations for prospective customers.

147.   Lee's unauthorized downloads contain trade secrets that are used in interstate and foreign commerce.

148.   Lee had no legitimate business reason to download any of the files because they were stored on Mirakl's servers and Lee had access to those servers to use for legitimate business purposes.

149.   In downloading from Mirakl's protected computers files that contain Mirakl's trade secrets and confidential information, Lee willfully misappropriated Mirakl's confidential information, exceeded his authorized access to Mirakl's protected computers, and improperly acquired Mirakl's trade secrets with a deliberate intent to injure Mirakl and improve his own financial gain.

150.   Lee also failed to comply with his contractual obligation to return to Mirakl all copies of all Mirakl trade secrets and confidential information.

151.   When VTEX hired Lee, VTEX knew that Mirakl, like VTEX and other employers in the industry, required that its employees agree to post-employment confidentiality obligations and trade secret protections.  Despite this knowledge, VTEX hired Lee to perform a job similar to the one he performed at Mirakl, and VTEX did so with knowledge that Lee inevitably would use or disclose Mirakl's trade secrets and confidential information by working for VTEX.  VTEX hired Lee with the intent of acquiring Mirakl's trade secrets and confidential information with improper motive and through improper means.  Thus, VTEX has improperly acquired Mirakl's trade secrets and confidential information and interfered with Lee's contractual obligations to Mirakl.

**Solicitation**

152.    While employed at Mirakl, Blanford, Brownell, Chang, Cochran, Yee, and Greff worked on the same team and reported to Lee.  The Individual Defendants worked together and routinely communicated with one another in the course of performing their job duties at Mirakl.

153.    On March 6, 2020, while both Chang and Yee still were employed by Mirakl, they exchanged email messages about the timing of Yee's departure from Mirakl two weeks later to commence employment with VTEX.

154.    Yee's email to Chang violated Yee's agreement to refrain from "directly or indirectly" soliciting or attempting to "hire or recruit" any Mirakl employee who worked for Mirakl in the 12-month period preceding Yee's last day of employment with Mirakl.  Yee Agreement, ECF 1-5, at ¶ 4(b).

155.    All of the Individual Defendants worked for Mirakl within the 12-month period preceding the departure of each of the other Individual Defendants.

156.    The Individual Defendants communicated with one another about working for VTEX both before and after their respective separations from employment with Mirakl.

157.    Communications among the Individual Defendants constituted direct and/or indirect solicitation of each other in violation of their respective agreements with Mirakl, as demonstrated by the sequence and close proximity of their respective departures from Mirakl.  Lee Agreement, ECF 1-3, at ¶ 4(b); Cochran Agreement, ECF 1-4, ¶ 4(b); Yee Agreement, ECF 1-5, at ¶ 4(b); Blanford Agreement, ECF 1-6, at ¶ 4(b); Brownell Agreement, ECF 1-7, at ¶ 4(b).

158.    Thus, Brownell, Blanford, Lee, Cochran, and Yee, and/or all of them solicited Greff and other Mirakl employees (including, without limitation, one or more of the Individual Defendants) in violation of their employee non-solicitation obligations to Mirakl.  Cochran, who was a Senior Business Development Representative and worked with all of the other Individual Defendants to help achieve the annual revenue goals of the Sales Team, left Mirakl on February 12, 2020.  He was followed by Lee (Executive Vice President Sales Americas) on March 2, Yee (Vice President of Solution Engineering – Americas) on March 20, Chang (Director of Sales, West Region) on March 31, Brownell (a Partner Sales Manager) and Blanford (a Sales Executive) on April 6, and Greff (an Education Expert) on September 1, 2020.  Thus, all seven former Mirakl employees left in rapid succession and were hired by VTEX within seven months from when Cochran began working there.

159.    As a result of Brownell, Blanford, Cochran, Lee, and Yee's solicitation of Mirakl employees in violation of their contractual obligations to Mirakl, the Company suffered monetary damages, including, but not limited to, incurring costs associated with identifying, recruiting, and training new employees to fill the positions that the Individual Defendants formerly held.

160.    In addition to violating their employee nonsolicitation obligations, Brownell, Blanford, Cochran, Lee, and Yee violated their customer nonsolicitation obligations. In the days before leaving Mirakl, they downloaded files with Mirakl customer information for use soliciting Mirakl's customers on behalf of entities other than Mirakl, including without limitation, VTEX.  By way of example only:

a.    Blanford downloaded a file entitled "Mirakl Summit 2020 –Sales Play" on March 31 and a file entitled "Prio 1 Accounts & Open Opps – Event

39

Target contacts"[2] on March 16.  His last day with Mirakl was April 6, 2020.

b.   Brownell downloaded a file entitled "Copy of Final Consolidated Account List" on April 2 and a file entitled "Introduction to Mirakl Partners & Alliances" on March 30.  His last day with Mirakl was April 6, 2020.

c.   Chang downloaded a file named "Mirakl -- Clients Overview All" on March 24 and a file named "Copy of George- Sale Territory - Named Account Tiering" on March 31.  His last day with Mirakl was March 31, 2020.

d.   Cochran downloaded a file named "L Gardner - Sale Territory - Named Account Tiering" on February 10 and a file named "Shoptalk Copy – Tim" on February 6. His last day with Mirakl was February 12, 2020.

e.   Lee downloaded a file named "Jan 27 2020 - Leadership meeting" on February 5 and a file named "Mirakl - Clients Overview All" on January 30.  Lee's last day was March 2, 2020.

f.   Yee downloaded files entitled "Mirakl - FInance Workshop.pptx" on March 19 and a file entitled "Development In Progress + Prioritized Topics" on March 9.  Yee's last day with Mirakl was March 20, 2020.

g.   Greff downloaded thousands of files that included file names such as "Marketplace Strategic Vision & Ambitions" and "Client Success-Services Strategic Workshops" on August 12 and 13.  His last day with Mirakl was September 1, 2020.  In addition, although his employment terminated over ten (10) weeks ago, Greff's LinkedIn page currently identifies him as a Mirakl employee.

161.   Since separating from employment with Mirakl, the Individual Defendants have improperly used Mirakl's Confidential Information, including but not limited to the those files referenced above, which they downloaded in the days before separating from Mirakl for the sole purpose of soliciting Mirakl's current and/or or prospective customers in violation of their written agreements with Mirakl.

162.   Greff has continued to represent himself publically as an employee of Mirakl to mislead potential customers and solicit them on behalf of VTEX.

---

[2] The reference to "Prio 1" Accounts relates to Mirakl's top priority accounts.

**Mirakl Has Suffered and Will Continue to Suffer Immediate and Irreparable Harm
if Injunctive Relief is Not Granted**

163.    Mirakl will suffer immediate and irreparable harm if temporary and preliminary injunctive relief is not granted.  As such, Mirakl respectfully seeks temporary and preliminary injunctive relief providing that Greff, Yee, Brownell, Blanford, Lee, Chang, and Cochran ("Individual Defendants") and any other persons or entities acting on their behalf or in active concert with them (including, without limitation, VTEX), be required to: (a) return any and all copies (in any format) of Mirakl's documents and files that any Individual Defendant forwarded and/or downloaded; (b) make available for forensic examination any and all computers or other devices capable of performing computing functions or storing information ("Devices") owned or used by any Individual Defendant at any time in the six months preceding the termination of their respective employments with Mirakl or since such termination dates, for the purpose of determining how each Individual Defendant has accessed, used, disclosed and/or disposed of Mirakl's confidential documents; (c) grant Mirakl access to any and all accounts used for the purpose of communicating with others (*e.g.*, electronic mail, instant message, social media, etc.) used by any Individual Defendant for the purpose of determining if the documents that they downloaded were forwarded; (d) grant Mirakl access to any and all personal mobile telephones, tablets, and other Devices owned or used by any Individual Defendant for the purpose of determining if such Devices contain copies of Mirakl's Confidential Information; and (e) take any other appropriate and reasonable steps to recover Mirakl's Confidential Information and to ensure that it was not distributed or preserved by any Individual Defendant or by VTEX in any form.  Mirakl also respectfully seeks an Order restraining Defendants from in any way accessing, using,

divulging, disseminating, or utilizing Mirakl's Confidential and Proprietary Information in the interim.

## COUNT I
## (BREACH OF CONTRACT – AS TO GREFF, CHANG, YEE, BROWNELL, BLANFORD, LEE, AND COCHRAN)

164.    The allegations of the preceding paragraphs are incorporated as though fully set forth herein.

165.    The Greff Agreement, the Chang Agreement, the Yee Agreement, the Brownell Agreement, the Blanford Agreement, the Lee Agreement, and the Cochran Agreement are enforceable agreements supported by consideration.

166.    The Greff Agreement, the Chang Agreement, the Yee Agreement, the Brownell Agreement, the Blanford Agreement, the Lee Agreement, and the Cochran Agreement are reasonable, consonant with public policy, and necessary to protect legitimate business interests of Mirakl.

167.    Mirakl performed its obligations to each Greff, Chang, Yee, Brownell, Blanford, Lee, and Cochran under the Greff Agreement, the Chang Agreement, the Yee Agreement, the Brownell Agreement, the Blanford Agreement, the Lee Agreement and the Cochran Agreement.

168.    By engaging in the conduct described above, each of the Individual Defendants has violated their contractual obligations to Mirakl.  This conduct includes, but is not limited to taking, using and/or disclosing Mirakl's Confidential Information and/or Trade Secrets.

169.    By engaging in the conduct described above, Cochran, Blanford, Lee, Yee, and Brownell violated their contractual obligations to refrain from directly or indirectly soliciting Mirakl employees.

170.    By engaging in the conduct described above, Greff, Cochran, Blanford, Lee, Yee, and Brownell have violated their contractual obligations to refrain from directly or indirectly soliciting Mirakl's current and/or prospective customers.

171.    As a direct and proximate result of the Individual Defendants' violations of their contractual obligations to Mirakl, Mirakl has suffered, and will continue to suffer, irreparable harm.

172.    Mirakl is threatened with losing the value of its trade secrets and confidential information and certain customer and partner relationships and ongoing goodwill.

173.    Mirakl also has suffered monetary injury as a result of the breaches of the Individual Defendants, in an amount to be proven at trial as to Defendants Chang and Lee all in amounts to be proven in arbitration as to Defendants Greff, Blanford, Brownell, Cochran, and Yee.

## COUNT II
### (VIOLATION OF MASSACHUSETTS TRADE SECRETS ACT; MASS. GEN. 93 § 42A – AS TO GREFF, YEE, BROWNELL, CHANG, BLANFORD, LEE, COCHRAN, and VTEX)

174.    Mirakl repeats and reasserts the allegations set forth in the foregoing paragraphs of the Complaint and incorporates them herein by reference.

175.    Mirakl is the rightful owner of its confidential, proprietary and trade secret information as described above including, without limitation, its proprietary technology, software, code, customer and client lists and information, pricing information, marketing

information, business plans, sales and statistical data, inventions and proprietary computer programs, and other nonpublic proprietary information, all of which contain information that has commercial value in Mirakl's business and constitutes trade secretes within the meaning of the Massachusetts Trade Secrets Act, M.G.L. c. 93, §§ 42, 42A-42G ("MTSA").

176.    Mirakl's trade secrets derive independent economic value from not being generally known to, or readily ascertainable by proper means by, the public, and other persons can obtain economic value from their disclosure and use.

177.    In their capacity as employees of Mirakl, the Individual Defendants had access to Mirakl's Confidential and Proprietary Information and trade secrets.

178.    This information is not generally available to third parties, including Mirakl's competitors, such as VTEX. It derives independent economic value from not being generally known to other persons who could otherwise obtain economic value from its disclosure or use, and it is the subject of efforts that are reasonable under the circumstances to maintain its confidentiality.

179.    As more fully described above, Mirakl has taken reasonable and adequate precautions to protect its confidential, proprietary and trade secret information.  Such measures include, but are not limited to, promulgating corporate policies and requiring that employees contractually agree not to disclose confidential information.

180.    The Individual Defendants are prohibited from misappropriating Mirakl's Confidential and Proprietary Information and trade secrets by their respective written agreements with Mirakl.

181.    The Individual Defendants were each aware of the confidential and proprietary nature of Mirakl's confidential, proprietary and trade secret information, and of their duty not to use such information for their own benefit, or for the benefit of any person or entity other than Mirakl.

182.    During their employment with Mirakl and in preparation for their separation from employment with Mirakl, the Individual Defendants unlawfully accessed and misappropriated Mirakl's Confidential Information and trade secrets through improper means and for their own benefit and use and for the benefit of VTEX and/or other future employers.

183.    Because of the overlap among the duties the Individual Defendants now perform for VTEX and the duties they previously performed for Mirakl, the Individual Defendants inevitably will use and/or disclose Mirakl's confidential, proprietary and trade secret information for their economic benefit and will use (or already have used) and/or disclose Mirakl's trade secrets to VTEX.

184.    The Individual Defendants took and retained Mirakl's Confidential and Proprietary Information and trade secrets after separating from employment with Mirakl and commencing employment with VTEX.

185.    The conduct of the Individual Defendants was willful and malicious within the meaning of the MTSA.

186.    VTEX knew, or should have known, that the Individual Defendants would use Mirakl trade secrets on behalf of VTEX.

187.    VTEX has actual knowledge that each of the Individual Defendants has a duty not to disclose Mirakl's confidential, proprietary, and trade secret information.

188.    Mirakl has suffered and will continue to suffer irreparable harm, including, but not limited to, a loss of its competitive advantage, loss of business, loss of goodwill, and other damage unless the Individual Defendants and VTEX are enjoined from continuing to benefit from any unlawful misappropriation of Mirakl's confidential, proprietary and trade secret information.

189.    Unless restrained, the Individual Defendants and VTEX will continue to misappropriate Mirakl's trade secrets in violation of the MTSA.

190.    As a direct and proximate consequence of the Individual Defendants' and VTEX's conduct, Mirakl has been damaged.

191.    The Individual Defendants' and VTEX's wrongful conduct was willful, malicious, and done in conscious disregard of Mirakl's rights, and as to Defendants Lee, Chang and VTEX, Mirakl is entitled to punitive damages and attorneys' fees, and costs in an amount to be proven at trial.  As to the remaining Individual Defendants, Mirakl is entitled to damages, fees, and costs in an amount to be proven in arbitration.

192.    Pursuant to the MTSA, Mirakl is entitled to preliminary and permanent injunctive relief, enjoining and restraining the Individual Defendants and VTEX from all acts of actual and threatened misappropriation of the trade secrets of Mirakl.

## COUNT III
### (VIOLATION OF THE DEFEND TRADE SECRETS ACT; 18 U.S.C. § 1833, *et seq.* – AS TO ALL DEFENDANTS)

193.    Mirakl repeats and reasserts the allegations set forth in the foregoing paragraphs of the Complaint and incorporates them herein by reference.

194.    During the course of their employment relationships with Mirakl, the Individual Defendants had access to substantial amounts of Mirakl's Confidential Information as described above.

195.    Mirakl's trade secrets, Proprietary Information, and Confidential Information, as set out above, constitute trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. ("DTSA")

196.    Mirakl's Confidential Information is not available to the general public and is closely guarded by Mirakl. Mirakl keeps such information strictly confidential to protect and maintain an economic advantage in its industry.

197.    Mirakl's Confidential Information is considered a trade secret under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1833, *et seq.,* because Mirakl derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use*,* and Mirakl has taken reasonable efforts to maintain the secrecy of this information.

198.    Mirakl's trade secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce.

199.    At all relevant times, Mirakl has taken reasonable and necessary measures to safeguard the secrecy and confidentiality of its information and business intelligence, including trade secrets.  Such measures include, without limitation, promulgating corporate policies and requiring that employees contractually agree not to use or disclose confidential information and trade secrets for any purpose other than to benefit Mirakl.

200.    As demonstrated by their downloading of Mirakl's Confidential Information, the Individual Defendants gathered and exposed themselves to Mirakl's trade secrets even when they were in the process of obtaining employment with VTEX. As demonstrated by their conduct since separating from Mirakl, they have no intention of abiding by their obligations not to refrain from using or disclosing Mirakl's trade secrets.

201.    Each of the Individual Defendants currently works for VTEX and inevitably will use or disclose Mirakl's Confidential Information in the course of performing their work for VTEX.

202.    The Individual Defendants retained Mirakl's trade secrets after ceasing employment with Mirakl and after accepting and commencing employment with VTEX.

203.    The Individual Defendants already have used or disclosed or inevitably will use or disclose Mirakl's trade secrets in connection with performing their work for VTEX.

204.    As more fully described above, the Individual Defendants misappropriated Mirakl's trade secrets through improper means.

205.    The conduct of the Individual Defendants was willful and malicious.

206.    By serially hiring the Individual Defendants and placing them in roles analogous to the jobs they held while working for Mirakl, VTEX has willfully and maliciously obtained Mirakl's trade secrets through improper means.

207.    By misappropriating and inevitably using or disclosing Mirakl's trade secrets while acting as agents of VTEX, the Individual Defendants and VTEX have created an unfair advantage for VTEX in competing with Mirakl using Mirakl's trade

secrets and being able to target Mirakl's customer and partner relationships and goodwill at Mirakl's expense.

208.    Injunctive relief is therefore appropriate.

209.    Accordingly, Mirakl requests that this Court enter an order enjoining the Individual Defendants and VTEX from using any of Mirakl's Confidential Information, and from disclosing Mirakl's Confidential Information to anyone other than authorized personnel of Mirakl.

210.    Mirakl also requests that this Court enter an order requiring that all Defendants immediately return any and all of Mirakl's hardcopy Confidential Information, Proprietary Information, and/or trade secrets to Mirakl, take all steps necessary to effectuate the deletion and/or removal of any of Mirakl's Confidential Information from all Devices (without regard to ownership status) that contain such information.

211.    The Individual Defendants' misappropriation of Mirakl's trade secrets has been willful and malicious, and Mirakl has incurred significant damages as a result of the Individual Defendants' misappropriation.

212.    The actions of the Individual Defendants' also has damaged Mirakl's goodwill, reputation, and legitimate business interests.

213.    Mirakl is therefore entitled to recover from Defendants Lee, Chang, and VTEX not only compensatory damages, but also punitive damages and attorneys' fees resulting from their wrongful misappropriation of Mirakl's confidential information. Mirakl further is entitled to punitive damages, fees, and costs from the remaining Individual Defendants in arbitration.

## COUNT IV
## (VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA") 18 U.S.C. § 1030 – AS TO ALL INDIVIDUAL DEFENDANTS)

214.    Mirakl repeats and reasserts the allegations set forth in the foregoing paragraphs of the Complaint and incorporates them herein by reference.

215.    It is a violation of the CFAA to "knowingly cause[] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[] damage without authorization, to a protected computer."

216.    It is also violation of the CFAA to "intentionally access[] a protected computer without authorization, and as a result of such conduct, recklessly cause[] damage."

217.    Each of the Individual Defendants, exceeding his authorization, downloaded Mirakl's Confidential Information from protected computers that Mirakl uses in interstate or foreign commerce and/or communication to a personal computing device or storage repository that is not owned by Mirakl.

218.    Each of the Individual Defendants caused damages and loss to Mirakl by exceeding his authorized access to Mirakl's protected computers and misappropriating Mirakl Confidential and Proprietary Information and trade secrets.

219.    In addition, Chang, exceeding his authorization, destroyed the contents of a Mirakl device that contained files that Chang used in interstate or foreign commerce.

220.    The aforementioned conduct of the Individual Defendants violates the CFAA.

221.    As a direct and proximate result of the Individual Defendants' violations of the CFAA, Mirakl has suffered financial loss in excess of $5,000.00, including the cost

of the expenditures that have been necessary to investigate, assess, and attempt to remedy the Individual Defendants' violations of this statute.

222.    As a direct and proximate result of the Individual Defendants' violations of the CFAA, Mirakl has suffered damages and loss.  As to Lee and Chang, Mirakl is entitled to compensatory damages, injunctive relief, and other equitable relief and attorneys' fees allowable under 18 U.S.C. § 1030(g)  in an amount to be determined according to proof at trial.  As to the remaining Individual Defendants, Mirakl is entitled to such an award in arbitration.

## COUNT V
## (BREACH OF LOYALTY/FIDUCIARY DUTY – AS TO INDIVIDUAL DEFENDANTS)

223.    Mirakl repeats and reasserts the allegations set forth in the foregoing paragraphs of the Complaint and incorporates them herein by reference.

224.    As more fully described above, Mirakl employed the Individual Defendants in positions of significant trust and confidence.

225.    As individuals employed by Mirakl in positions of significant trust and confidence, the Individual Defendants owed Mirakl a duty of loyalty that included, but was not limited to, a duty to act in Mirakl's best interest.

226.    During their employment with Mirakl, each the Individual Defendants owed Mirakl a continuing duty of loyalty, which included, but was not limited to, safeguarding its Confidential Information and trade secrets, and not interfering with, or taking actions that would disrupt its business operations or cause it a competitive disadvantage.

227.    During their employment with Mirakl, the Individual Defendants improperly acquired and retained Mirakl's Confidential Information for their own benefit with the intent of retaining such information and using it for the benefit of one or more competitors of Mirakl, including, but not limited to, VTEX.

228.    As a direct and proximate result of the Individual Defendants' conduct, Mirakl sustained and continues to sustain immediate and irreparable injury, including, but not limited to, losses in profits and revenues, losses of business relations with current customers, loss of business relations with future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy.

229.    As a direct and proximate result of the Individual Defendants' conduct, Mirakl has sustained and will continue to sustain actual and/or consequential damage in an amount to be determined at trial, and Mirakl is entitled to recover such damages from Lee and Chang in this action and from the remaining Individual Defendants in arbitration.

230.    The Individual Defendants' wrongful conduct was willful, malicious, and done in conscious disregard of Mirakl's rights, entitling Mirakl to punitive damages and attorneys' fees and costs from Lee and Chang in an amount to be proven at trial and from the remaining Individual Defendants in an amount to be proven in arbitration.

## COUNT VI
## (TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS - AS TO VTEX)

231.    Mirakl repeats and reasserts the allegations set forth in the foregoing paragraphs of the Complaint and incorporates them herein by reference.

232.     Each of the agreements between Mirakl and the Individual Defendants is an enforceable written contract with Mirakl wherein each promised not to use or disclose Mirakl's Confidential Information for any purpose other than in service to Mirakl.

233.     At all relevant times, VTEX had actual knowledge that the Individual Defendants were subject to an agreement not to disclose Mirakl's Confidential Information.

234.     VTEX also had actual knowledge that some of the Individual Defendants were bound by contractual obligations to refrain from indirectly or soliciting employees, customers, or prospective customers of Mirakl.

235.     VTEX intentionally solicited the Individual Defendants to perform duties analogous to the duties each Individual Defendant performed while working for Mirakl.

236.     VTEX intentionally solicited the Individual Defendants with actual knowledge of their contractual obligations to Mirakl and actual knowledge that each of them intentionally and/or inevitably would use or disclose Mirakl's Confidential Information while working for VTEX, in breach of their respective Agreements.

237.     VTEX has compensated, and continues to compensate, the Individual Defendants despite their breaches of their contractual confidentiality and nonsolicitation obligations to Mirakl.

238.     By permitting the Individual Defendants to continue working in roles in which they inevitably will use and/or disclose Mirakl's trade secrets and confidential information to VTEX and violate their nonsolicitation obligations to Mirakl, VTEX has used improper means to interfere with Mirakl's contractual relations with the Individual Defendants.

239.   As a direct and proximate result of VTEX's conduct, Mirakl has sustained and continues to sustain immediate and irreparable injury, including, but not limited to, losses in profits and revenues, losses of business relations with current customers, loss of business relations with future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy.

240.   As a direct and proximate result of VTEX's conduct, Mirakl has sustained and will continue to sustain actual and/or consequential damages in an amount to be determined at trial, and Mirakl is entitled to recover such damages.

241.   VTEX's wrongful conduct was willful, malicious, and done in conscious disregard of Mirakl's rights, entitling Mirakl to punitive damages and attorneys' fees and costs in an amount to be proven at trial.

WHEREFORE, Plaintiff Mirakl, Incorporated respectfully requests that this Court enter judgment for Mirakl and against the Individual Defendants and VTEX, as follows:

A.   Temporarily, preliminarily and permanently enjoining the Individual Defendants and VTEX from acquiring, accessing, using, disclosing, or misappropriating Mirakl's Confidential Information and trade secrets and award against Lee, Chang and VTEX all of Mirakl's compensatory damages, exemplary damages, punitive damages, costs and attorney fees resulting from such misappropriation;

B.   Temporarily, preliminarily, and permanently enjoining Defendants Greff, Brownell, Blanford, Lee, Cochran, and Yee from violating their respective obligations to refrain from soliciting Mirakl's customers and/or prospective customer's;

C.   Temporarily, preliminarily, and permanently enjoining Defendants Greff, Brownell, Blanford, Lee, Cochran, and Yee from violating their respective

obligations to refrain from soliciting employees of Mirakl;

D.      Ordering the Individual Defendants and VTEX to immediately return to Mirakl any and all of Mirakl's electronic and hardcopy Confidential Information, Proprietary Information, and/or trade secrets and to take all steps necessary to effectuate a forensic examination of any and all devices capable of performing computing functions or storing electronic information that are owned by, have been used by, or been accessible to the Individual Defendants at any time since the date six months prior to the date on which each individual's employment with Mirakl terminated for the purpose of determining how each has accessed, used, disclosed, or misappropriated Mirakl's Confidential Information, Proprietary Information, and/or trade secrets;

E.      Granting Mirakl access to any and all personal accounts used for communication purposed by any of the Individual Defendants so that Mirakl may determine the extent to which any of them (1) retained, used, or disclosed any of Mirakl's Confidential Information, Proprietary Information, and/or trade secrets, (2) violated their Customer Nonsolicitation Obligations; and/or (3) violated their Mirakl Employee Nonsolicitation Obligations;

F.      Granting Mirakl access to any and all Devices owned, used or accessed by the Individual Defendants for the purpose of determining if these Devices contain copies of Mirakl's Confidential Information, and permitting Mirakl to take any other appropriate and reasonable steps to recover its Confidential Information and to ensure that it was not distributed or preserved by the Individual Defendants, or VTEX, in any form;

G.      Restraining the Individual Defendants and VTEX from in any way

divulging, disseminating, or utilizing Mirakl's confidential and proprietary information in the interim;

      H.     Enjoining Greff from continuing to falsely represent in any forum, including, without limitation, online, that he remains affiliated in any way with Mirakl.

      I.     Awarding against Defendants Chang, Lee and VTEX exemplary damages, punitive damages, costs and attorneys' fees in an amount sufficient to punish them for the foregoing wrongful conduct and deter future wrongful conduct;

      J.     Entering judgment against the Individual Defendants and VTEX and award as against Defendants Lee, Chang, and VTEX prejudgment and post-judgment interest, plus costs, attorneys' fees and such other and further relief, at law or in as the Court deems just; and

      K.     Providing such further relief as the court deems just under the circumstances.

                      Respectfully submitted,

                      /s/ Danielle Y. Vanderzanden
                      Danielle Y. Vanderzanden (BBO #563933)
                      OGLETREE, DEAKINS, NASH, SMOAK
                      & STEWART, P.C.
                      One Boston Place, Suite 3500
                      Boston, MA  02108
                      Telephone: 617-994-5700
                      Facsimile: 617-994-5701
                      danielle.vanderzanden@ogletree.com

                      *Attorney for Plaintiff*

Dated:  November 19, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of November, 2020, this document filed through the ECF system, will be sent electronically to the registered participants on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants.

<u>/s/ Danielle Y. Vanderzanden</u>
Danielle Y. Vanderzanden

44998814.1